939 So.2d 290 (2006)
IDALIA MALDONADO, Appellant,
v.
PUBLIX SUPERMARKETS, Appellee.
No. 4D04-4335.
District Court of Appeal of Florida, Fourth District.
October 18, 2006.
G. Ware Cornell, Jr. and Arianne Bombalier Suarez of Cornell & Associates, P.A., Weston, for appellant.
Annette Torres and Andrew L. Rodman of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, for appellee.
GROSS, J.
Idalia Maldonado appeals an order granting summary final judgment in favor of Publix Supermarkets on her complaint for sexual harassment under section 760.01, et seq., Florida Statutes (2003), the Florida Civil Rights Act of 1992. We affirm, holding that the undisputed facts did not rise to the level of actionable sexual harassment under the Act.
In 1989, Maldonado commenced her employment with Publix as a meat wrapper. In 1998, Maldonado transferred to a different location, Store 159 in Coral Springs, where she became a seafood specialist. At that store, Maldonado worked with Catalino Vazquez, who worked as a meat cutter. Vazquez worked at Store 159 between April 10, 1999 and November 23, 2002; he did not supervise Maldonado or any other employees.
In 2001, Vazquez "passed his hand" along Maldonado's right side, between Maldonado's hip and buttocks, as she left the freezer carrying four or five bags of shrimp. Vazquez did not say anything as he brushed Maldonado's side. Maldonado did not know if the touching was intentional.
Shortly after the incident, Maldonado told meat manager Bill Thompson,[1] her supervisor, that Vazquez had touched her hip. Thompson immediately spoke to Vazquez in Maldonado's presence. Stating that he wanted no problems in the meat department, Thompson told Vazquez not to let it happen again and directed Vazquez to respect Maldonado. Vazquez told Thompson and Maldonado that "he didn't do anything intentionally, that he did it unintentionally, and that [Maldonado] should forgive him." Vazquez also told Maldonado "he wouldn't do it again."
Maldonado was satisfied with Thompson's response to her complaint and reported that "it seemed [to her] that the problem was resolved." Between the 2001 incident and August 14, 2002, Vazquez did not touch Maldonado in any inappropriate way.
On August 14, 2002, Vazquez grabbed Maldonado's buttocks while she was grinding some meat. In response, Maldonado punched Vazquez in his back and told him to respect her. Vazquez then told Maldonado that she "was going to be his."
The next morning, Maldonado told assistant meat manager Tricia Robotham about what happened. Robotham immediately alerted the new meat manager, Don Galeno. Robotham and Galeno then informed store manager, Martin Jenner, who said that he would speak to both Maldonado and Vazquez.
The same day, Jenner spoke to Maldonado. Maldonado told Jenner about what transpired the day before with Vazquez. Jenner told Maldonado that he would speak to Vazquez and "handle the situation." Later that same day, Galeno also spoke to Maldonado. After hearing Maldonado's explanation of the incident, Galeno told her that if she felt "worried" or "bad," that she could go home. Galeno assured Maldonado that Jenner would speak to Vazquez.
Because Vazquez did not work on August 15, Jenner spoke to him the next day. The store manager told Vazquez about Maldonado's complaint and that Vazquez should keep his distance from Maldonado and respect her. After hearing Vazquez's side of the story, Jenner explained to Vazquez that he intended to document the incident in a counseling statement.
On August 17, 2002, Jenner presented Vazquez with an "associate counseling statement," which warned Vazquez to keep his hands to himself and required immediate compliance. Jenner placed the counseling statement in Vazquez's personnel file and forwarded a copy to the Publix corporate office. Jenner also reviewed Publix's written sexual harassment policy with Vazquez. In addition, Jenner suggested, and Vazquez agreed, that Vazquez should transfer out of Store 159. Publix effectuated the transfer in November, 2002, the first date that a comparable position became available at another store.
Jenner reported to Maldonado the substance of his conversations with Vazquez. Jenner told Maldonado that Vazquez promised he "wouldn't do it again," and, indeed, Vazquez never touched Maldonado again.
About three to four weeks after the August 14 incident, Vazquez entered the cooler where Maldonado was working and "bit his lip." Maldonado interpreted the lip biting as meaning "[y]ou're really hot." Maldonado left the cooler quickly. Vazquez made no comments to Maldonado during this encounter.
Almost a week later, Vazquez again "bit his lip" while he and Maldonado were in the cooler. Again, Vazquez made no comments to Maldonado during this interaction.
After the second lip-biting incident, Maldonado told assistant store manager, Don Bridwell, what happened. Bridwell told Maldonado that he would "write it down" and that he and Galeno would sit down with Vazquez to make sure that nothing else would happen.
As a result of the lip-biting incidents and at Maldonado's request, Publix attempted to schedule Maldonado and Vazquez so that their shifts would not overlap. Maldonado testified that Vazquez did not do anything else inappropriate between the second lip-biting incident and the date Vazquez was transferred out of the store in November, 2002.
The trial court granted Publix's motion for summary judgment.
To obtain a final summary judgment, the moving party must conclusively demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to a judgment as a matter of law. See Fla. R. Civ. P. 1.510(c); Holl v. Talcott, 191 So. 2d 40, 43 (Fla. 1966). "The proof must be such as to overcome all reasonable inferences which may be drawn in favor of the opposing party." Holl, 191 So. 2d at 43. Since the correctness of summary judgment is a question of law, this court reviews the matter de novo. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So. 2d 126 (Fla. 2000).
Sexual harassment is a form of sex discrimination prohibited by the Florida Civil Rights Act, so that an employee may assert a claim for sexual harassment under section 760.10, Florida Statutes (2003). Similar to Title VII of the Civil Rights Act of 1964,[2] Florida's Civil Rights Act prohibits both employment discrimination and discrimination against any individual with respect to his or her compensation, terms, conditions or privileges of employment, on the basis of "race, color, religion, sex, national origin, age, absence of handicap, or marital status." See § 760.10, Fla. Stat. (2003); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999). Although neither the Florida nor Federal Civil Rights Acts specifically mention sexual harassment, the United States Supreme Court has long recognized that `"[t]he phrase `terms conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Mendoza, 195 F.3d at 1244-45 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751 (1998) (indicating that there are two types of sexual harassment cases: (1) quid pro quo, which are "based on threats which are carried out" or fulfilled, and (2) hostile environment, which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment").
Where harassment is perpetrated by a co-worker (as opposed to a supervisor or manager), to establish a hostile work environment sexual harassment claim, an employee must show that: (1) the employee is a member of a protected group; (2) the employee was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) the harassment was based on the sex of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer knew or should have known about the harassment and took insufficient remedial action. See Speedway SuperAmerica, LLC v. Dupont, 933 So. 2d 75, 80 (Fla. 5th DCA 2006); see also Natson v. Eckerd Corp., 885 So. 2d 945, 947 (Fla. 4th DCA 2004) (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 n. 3 (11th Cir. 2000) and Castleberry v. Edward M. Chadbourne, Inc., 810 So. 2d 1028, 1029-30 (Fla. 1st DCA 2002)).
This case presents two issues: (1) whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of Maldonado's employment and (2) assuming the sexual harassment was sufficiently severe and pervasive, whether Publix failed to take adequate remedial action.
Whether "the conduct complained of was `sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment'  is the element that tests the mettle of most sexual harassment claims." Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (internal citations omitted). As the eleventh circuit has written,
[r]equiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere `general civility code.' Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory `conditions of employment.'" Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998).
Gupta, 212 F.3d at 583. Having reviewed the Supreme Court's sexual harassment cases, both the eleventh and fifth circuits have concluded that all of those cases "`have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct.'" Id. at 586 (quoting Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 (5th Cir.1999)).
In a sexual harassment suit, if offensive conduct is gender-related or sexual in nature, courts consider four factors to determine, from an objective standpoint, whether such conduct is sufficiently severe and pervasive to alter the terms and conditions of employment and state an actionable claim of sexual harassment. See Harris, 510 U.S. at 23; Gupta, 212 F.3d at 584; Mendoza, 195 F.3d at 1246. These factors are: 1) the frequency of the conduct; 2) severity of the conduct; 3) whether the conduct was physically threatening or humiliating; and 4) whether the conduct unreasonably interfered with the employee's job performance. Mendoza, 195 F.3d at 1246. `"[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the `terms and conditions of employment.'" Faragher, 524 U.S. at 788 (internal citations omitted); see also Willets v. Interstate Hotels, LLC, 204 F. Supp. 2d 1334, 1336 (M.D. Fla. 2002). An analysis of the severity factors includes a subjective and objective component, in that the employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and the subjective perception must be objectively reasonable. Mendoza, 195 F.3d at 1246 (citing Harris, 510 U.S. at 21-22). The objective severity of the harassment must be judged from the perspective of a reasonable person in the plaintiff's position, taking into consideration all the circumstances. Id. (citing Oncale, 523 U.S. at 81).
Analyzing this case in light of the four factors identified above, we conclude that, as a matter of law, Maldonado did not endure conduct that was sufficiently severe and pervasive to support an action for sexual harassment.
On the factor of frequency, Maldonado's allegations amounted to four isolated incidents that occurred over a period of almost two and one-half years. Courts reviewing similar patterns have held that such conduct does not give rise to a sexual harassment claim. For example, in Mendoza, the eleventh circuit concluded that "a single instance of slight physical contact, one arguably inappropriate statement, and three instances of [a co-worker] making a sniffing sound[,] . . . over an eleven month period," were "far too infrequent to alter conditions" under which the harassment victim was required to perform her job. 195 F.3d at 1249 (citing Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show a hostile environment, even though an offensive statement from one of the harassers occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can")).
This case contrasts with Speedway SuperAmerica, where a female employee was subjected to repeated, countless acts of verbal and physical harassment over a nine-week period; the employee was subjected to offensive conduct "every time she worked [with the offender] on a typical eight-hour shift." 933 So. 2d at 81.
On the issue of the severity, Vazquez's conduct failed to cross the Mendoza line or the baseline established by the Supreme Court in cases such as Harris or Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986). The first touching of Maldonado's hip, the buttocks grabbing incident, and the two lip bites do not constitute the "hellish" work environment necessary to establish a sexual harassment claim. See Perez v. Norwegian-Amer. Hosp., Inc., No. 03-1619, 2004 WL 422555 (7th Cir. Mar. 5, 2004) (granting summary judgment and holding that a single slap on the buttocks does not create the requisite "hellish" work environment to establish a sexual harassment claim); see also Snellgrove v. Teledyne Abbeville, 117 F. Supp. 2d 1218 (M.D. Ala. Ct. 1999) (granting summary judgment on sexual harassment claim where one plaintiff alleged that a co-worker placed his hands on her breasts and that another co-worker touched her buttocks). Mendoza found that the following four instances of harassing conduct were not "severe" within the meaning of the four part test:
(1) one instance in which [the harasser] said to Mendoza "I'm getting fired up"; (2) one occasion in which [the harasser] rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which [the harasser] made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) [the harasser's] "constant" following and staring at Mendoza in a "very obvious fashion."
195 F.3d at 1248.
As to the third aspect of the test, most of Vazquez's inappropriate conduct was neither physically threatening nor humiliating. Maldonado conceded that the first touching incident may have been unintentional, which undermines the suggestion that it was physically threatening. Mendoza, 195 F.3d at 1248 (where court indicated that brushing up against plaintiff's hip was neither threatening nor humiliating). The lip bites were, at worst, flirtatious "come-ons." Mere flirtation does not constitute sexual harassment. In Gupta, the eleventh circuit noted that "flirtation is not sexual harassment" and that employers cannot be required to ensure that employees never look or stare at each other in a way that may be perceived as a "come on." 212 F.3d at 584-85.
"The fourth factor in determining whether conduct and statements are `sufficiently severe or pervasive' to create a hostile work environment is whether the conduct and statements unreasonably interfere with the plaintiff's job performancea factor which involves both a subjective and objective inquiry." Id. at 586. After the buttocks grabbing incident, Maldonado testified that she quickly punched out without cleaning her meat-grinding machine. However, Maldonado continued to work following her reports of Vazquez's conduct, and she continues to work for Publix to this day.
Vazquez's sporadic and non-threatening conduct would not have interfered with a reasonable person's job performance. Maldonado's subjective beliefs about the effect of Vazquez's conduct on her job performance "are not [a] complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component." Gupta, 212 F.3d at 586.
Maldonado relies on Oncale v. Sundowner Offshore Services, Inc.., 523 U.S. 75 (1998), Vance v. Southern Bell, 863 F.2d 1503 (11th Cir. 1989), and Russell v. KSL Hotel Corp., 887 So. 2d 372 (Fla. 3d DCA 2004), to support her contention that the trial court erred in granting Publix's motion for summary judgment. Maldonado's reading of Oncale is flawed, and her reliance on Vance and Russell is misplaced.
In Oncale, the Supreme Court dealt with the narrow issue of whether Title VII prohibits same-sex sexual harassment, which in Oncale consisted of male-on-male physical assaults and threatened rape. Justice Scalia delivered the opinion for the Court and answered that question affirmatively. Maldonado contends that the following language from Oncale establishes that a buttocks grab or slap constitutes sexual harassment:
In same-sex (as in all) harassment cases, that inquiry [into the objective severity of harassment] requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field-even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office.
523 U.S. at 81.
However, this discussion occurs in a paragraph where Justice Scalia is demonstrating the importance of placing particular behavior in social context for purposes of sexual harassment analysis. That the Court did not intend to expand the definition of sexual harassment is demonstrated by Oncale's discussion of why the Court's recognition of same-sex sexual harassment would not transform Title VII into a "general civility code," and that "common sense" and "sensitivity to social context" would guide the courts in recognizing the difference between "simple teasing" and "severely hostile or abusive" conduct. Oncale, 523 U.S. at 81-82. Oncale reaffirmed that Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact," that it forbids "only behavior so objectively offensive as to alter the `conditions' of the victim's employment," and that courts and juries must not mistake ordinary socializing in the workplace, including sexual flirtation, for discriminatory conditions of employment. Id. at 81.
Maldonado cites Vance for the proposition that the sexual harassment inquiry must be based on a totality of the circumstances, which includes consideration of the severity, as well as the number, of incidents at issue. However, Vance involved conduct that was more egregious and shocking than what is at issue here. The plaintiff's allegations of racial harassment in Vance included two incidents of hanging a noose from the light fixture in plaintiff's work station. Vance held that the severity of the alleged harassment must be determined by the totality of the circumstances, and that a reasonable jury could have concluded that plaintiff was subjected to racial harassment. Vance, 863 F.2d at 1511. As the Vance court acknowledged, "[i[t is hard to imagine an incident of this sort taking place in 1984. The grossness of hanging an object resembling a noose at the work station of a black female is self evident." Id. at 1511 n. 4. Given this country's tumultuous history of race relations, the symbolism of a noose, like a burning cross or a swastika, is clear. While Vazquez's conduct should not be condoned, it does not rise to the level of workplace misconduct evident in Vance.
Maldonado also cites to Russell. However, that case involved more extensive and severe harassment than what occurred in this case. In Russell, the plaintiff presented evidence at trial that the harasser, a non-supervisory colleague, engaged in the following conduct: 1) expressed dissatisfaction that defendant had hired a woman (the plaintiff) for a pastry chef position; 2) pulled the plaintiff towards him and kissed her on the cheek; 3) laughed at the plaintiff and made kissing noises when the plaintiff protested that he had kissed her on the cheek when they first met; 4) frequently came up behind plaintiff making kissing noises, cursed at her, tapped on her back, laughed at her, and on one occasion pushed her ear very hard; 5) on several occasions approached plaintiff from the rear, rammed his erect penis into her buttocks and whispered in her ear, "Fuck you, Kitty. Fuck you."; 6) threw a plastic water bottle at plaintiff inside the pastry kitchen freezer and hit plaintiff in the neck; and 7) said to another male employee loud enough for plaintiff to hear, "How many times should we fuck her? Should we call her husband? How many times can we fuck her?," followed by the men's laughter. 887 So. 2d at 374-75. Vazquez's conduct does not approach the conduct described in Russell.
Even assuming that Vazquez's conduct rose to the level of actual harassment, we find that Publix's corrective action was immediate, appropriate, and reasonably likely to stop the harassment, thereby precluding any finding of liability. See Natson, 885 So. 2d at 947; Saxton v. AT&T, Co., 10 F.3d 526, 536 (7th Cir. 1993); see also Watson v. Blue Circle, Inc., 324 F.3d 1252, 1257 (11th Cir. 2003) (citing Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000)); Landgraf v. USI Film Prods., 968 F.2d 427 (5th Cir. 1992). Publix supervisors confronted Vazquez within twenty-four hours of Maldonado informing them of her complaints. The supervisors used an escalating pattern of disciplineverbal warning, adverse counseling statement, rescheduling and transferdesigned to end Vazquez's offensive conduct. See Saxton, 10 F.3d at 536 (recognizing that a transfer of an offending employee satisfied employer's obligation to take steps reasonably likely to stop harassment).
Affirmed.
GUNTHER and FARMER, JJ., concur.
Not final until disposition of timely filed motion for rehearing.
NOTES
[1] Maldonado did not recall the day, month, year, or season of this first incident. Her supervisor, Bill Thompson, to whom she reported the incident, worked at Store 159 between March 11, 2000 and August 18, 2001.
[2] The Florida Civil Rights Act is patterned after Title VII, and therefore federal case law regarding Title VII is applicable. See Castleberry v. Edward M. Chadbourne, Inc., 810 So. 2d 1028, 1030 n. 3 (Fla. 1st DCA 2002).